**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | |
| **OLDE PRAIRIE BLOCK OWNER,** | ) | **No. 11 C 160 (Consolidated)** |
| **LLC,** | ) | |
| | ) | **Judge Ronald A. Guzmán** |
| **Debtor** | ) | |
| _____ | ) | |
| **CENTERPOINT PROPERTIES TRUST,** | ) | |
| | ) | **Appeal from** |
| **Appellant,** | ) | **U.S.B.C. No. 10-22668** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **OLDE PRAIRIE BLOCK OWNER,** | ) | |
| **LLC,** | ) | |
| | ) | |
| **Appellee.** | ) | |

**MEMORANDUM OPINION AND ORDER**

CenterPoint Properties Trust, one of the creditors of Old Prairie Block Owner, LLC ("Debtor"), which is in Chapter 11 bankruptcy proceedings, appeals the bankruptcy court's: (1) December 10, 2010 order denying CenterPoint's motion to amend findings of fact and conclusions of law; (2) December 13, 2010 and March 31, 2011 orders granting Debtor's motion to enter into a debtor-in-possession credit facility secured by a superpriority priming lien on the Debtor's assets; and (3) the February 14, 2011 order denying CenterPoint's motion to enforce order on its motion to lift the automatic stay. For the reasons set forth below, the Court dismisses the appeals of the December 13, 2010 and March 31, 2011 orders and affirms the December 10, 2010 and February 14, 2011 orders.

**Facts**

Debtor owns real estate at 230 E. Cermak Road ("Olde Prairie Property") and 330 E. Cermak Road ("Lakeside Property"), near McCormick Place, which it hopes to develop into a hotel complex. (A-420.) Debtor has a long-term lease with the owner of McCormick Place that allows it to use 450 parking spaces, rent-free, at the McCormick Place parking garage until 2203. (A-420-21.)

On February 22, 2008, Debtor signed a promissory note, secured by its real estate, for a $37,127, 667.03 loan from CenterPoint. (A-421.) When the note matured on February 21, 2009, Debtor defaulted. (*Id.*)

On February 24, 2009, CenterPoint filed a foreclosure action in state court, and on May 28, 2009, the state court appointed a receiver to remediate building code violations that had been found on the Debtor's properties. (*Id.*)

On May 18, 2010, Debtor filed chapter 11 bankruptcy. (A-420.) At the time, it owed CenterPoint $48,438,758.49 on the note. (A-421.)

On June 2, 2010, CenterPoint moved to dismiss the bankruptcy case or, in the alternative, to lift the automatic stay to allow the foreclosure action to proceed ("stay motion"). (*Id.*) The bankruptcy court held an evidentiary hearing on the motion and, on September 17, 2010, made oral "findings of fact and conclusions of law to be supplemented [later]." (A-516.) In relevant part, the court said:

> Under 11 USC 362(d)(2), relief from stay may be ordered if a debtor in Chapter 11 does not have equity in the property that is the subject of the creditor's security, and that property is not necessary to an effective reorganization. . . .
>
>     . . . .

> While I will and do find that the value of the security that is securing the creditor's interest is sufficient to cover the debt claimed by the creditor, the projection by debtor's expert of a large equity cushion cannot be accepted.
>
> While his analysis persuasively showed that the large values he opined should the property at issue be developed for a new hotel would be realistic in that event, the market of potential developers and investors has not stepped forward to invest. . . .

(A-516-19.)  Ultimately, however, the court denied the stay motion:

> Since the value is not declining, and since there is a plan in the offing that can likely be amended to make it confirmable, the motion to modify stay will be denied for these reasons, to be further amplified in . . . more detailed findings and conclusions to made and entered when we have the time to complete that.
>
> The motion to modify stay will now be denied conditionally on, (1) payment of all post-petition real estate taxes; (2) taking all steps necessary to maintain the properties so as to comply with city building codes and protect the creditor from any priming lien by the special receiver; and, (3) prompt amendments to the proposed plan . . . .

(A-520.)

On September 28, 2010, the court issued an order, *nunc pro tunc* September 17, 2010, on

Centerpoint's stay motion, which states:

> [A]fter reviewing the argument, evidence, and pleadings presented by CenterPoint and the Debtor, as more completely described in the transcript of proceedings before this Court on September 17, 2010 (the "Ruling"), which the court shall supplement in a subsequent written ruling (the "Written Ruling") . . . , Centerpoint's Lift Stay Motion is conditionally denied for the reasons identified by the Court, and on the conditions set forth, in the ruling from the bench . . . .
>
> CenterPoint and the Debtor are hereby ordered to perform all of the acts required in the Ruling including without limitation (i) the Debtor's timely payment of property taxes and repairs to its properties as required by the City of Chicago, without allowing CenterPoint's collateral to be charged . . . .

(A-452.)

On October 29, 2010, the court issued written findings of fact and conclusions of law on

CenterPoint's stay motion.  (*See* A-420-28.)  Among other things, the court said:

. . . . In this case, it is clear that Debtor does have an equity cushion. Contrary to some comments in the original oral remarks from the bench, based on the evidence it is a large equity cushion but of uncertain protection for reason stated below.

Debtor's expert opined that the value of the Olde Prairie property was $15,300,000.00 and the MPEA's pre-condemnation offer to purchase that property for $17,7000,000.00 gives credence to that opinion. Regarding the Parking Lease, the Letter of Intent from LAZ persuasively shows that the relevant market for possible uses of the property values the Lease at $20,250,000.00 . . . . Therefore, it is found and held that the value of the Olde Prairie property is $15,3000,000.00 and the value of the Parking Lease is $20,250,000.00.

Unfortunately, Debtor did not provide any firm market-supported offers for the Lakeside Property. The value of that property, therefore, depends on the relative credibility of each party's expert appraiser. In this respect, it must be found that Debtor's expert was more credible than CenterPoint's expert. The latter's rejection of hotel development as the highest and best use of Debtor's properties cannot be accepted: the proximity of McCormick Place, the scarcity of nearby hotel rooms, and the oversupply of condominiums in the area all point to hotel development as the highest and best use. . . .

. . . . Therefore, his appraisal must be rejected, leaving only the opinions of Debtor's expert for guidance. Following Debtor's expert, it is found and held that the value of the Lakeside Property is $45,600,000.00.

Considering these valuations, the total value of the Debtor's property is found to be $81,150,000.00. This is far more than the approximately $48,000,000.00 that CenterPoint now claims to be owed by the Debtor. Accordingly, Debtor holds a large equity cushion, albeit one based in large part on theoretical appraisals not yet fully supported by marketplace interests.

(A-424-26).

On November 12, 2010, CenterPoint filed a motion to amend these findings of fact and conclusions of law, arguing that the court's September 17, 2010 oral statement that "there is no equity cushion," was final and binding and thus its subsequent written finding to the contrary violated Bankruptcy Rule 7052 and the doctrine of law of the case. (*See* A-499-504.)

In its December 10, 2010 order, the bankruptcy court disagreed on both counts:

> The Written Ruling was not entered upon a *sua sponte* motion under Rule 7052 or any other Rule, but under the authority of and as forecast by the Stay Relief Order, which explicitly provided that the Oral Remarks would be supplemented by later written findings and conclusions. . . .
>
>  . . . . The Written Ruling, therefore, was to fill in the obvious gaps in discussion of evidence relevant to the stay motion and were to supplement and flesh out the Oral Remarks, as provided in the Stay Relief Order.
>
>  . . . .
>
> CenterPoint argues that the law of the case doctrine bars the written finding as to property value because of the earlier oral statement from the bench that Debtor's realty lacked a significant equity cushion even though its value fully secured the creditor's lien. However, that oral statement as to value was clearly tentative as the Court prepared to analyze the large volume of evidence, including thick appraisal opinions. The Oral Remarks were made to provide guidance to counsel as to the general reasons that stay relief would be denied. It was stated several times in the Oral Remarks that final, formal, and written findings of fact and conclusions of law would be entered later after the Stay Relief Order was entered.

(A-5-7.)

On November 27, 2010, Debtor filed a motion pursuant to 11 U.S.C. § 364(d)(1) to enter into a debtor-in-possession credit facility of up to $4,000,000.00 with JMB Capital Partners, L.P. secured by a superpriority priming lien on substantially all of the debtor's assets ("DIP motion"). (A-610, 621); *see* § 364(d)(1) (permitting bankruptcy courts to allow a debtor to incur debt "secured by a senior . . . lien on property of the estate that is subject to a lien if: (1) the debtor is unable to obtain credit otherwise"; and (2) "there is adequate protection of the interest of the holder of the [existing] lien"). Debtor said it needed the money to pay real estate taxes, obtain an engineering feasibility study and pay lobbyists, lawyers and consultants to press for the passage of a law that would protect the future value of tax increment financing ("TIF") potentially available to Debtor. (*See generally* A-252-410.)

On December 6, 2010, CenterPoint filed a motion to enforce the bankruptcy court's order conditionally denying the stay motion on the grounds that the DIP motion, if granted, would violate the condition that Debtor pay property taxes without charging CenterPoint's collateral.  (A-1423-25.)

On December 10, 2010, the court held a preliminary hearing on the portion of the DIP motion related to Debtor's payment of property taxes due on December 13, 2010.  (*See* A-252-410.) After the hearing, the court granted the motion and found that:  (1) paying the taxes was necessary to reorganization; (2) "the security cushion which exists on this property is far more than adequate to protect . . . [CenterPoint's] interests"; (3) Debtor could not otherwise get credit; and (4) allowing CenterPoint to pay the taxes "would be manifestly a violation of [the court's] order that the estate not be charged with the payment of this tax."  (A-406-09.)

On December 13, 2010, the bankruptcy court entered an order granting the DIP motion "only to the extent and in the amount necessary to pay real estate taxes due today."  (A-1873.)  The order does not contain an explicit finding that JMB made the tax loan in good faith.  (*Id.*)

On December 14, 2010, Debtor asked the court to add a good faith finding to the December 13, 2010 order.  (A-2873-74.)  The bankruptcy court said it had no jurisdiction to do so but noted that it "certainly would have entered an order with that finding in it, and [believed the finding] was implicit [in the order]."  (A-2884.)

In January 2011, the court held a hearing on the rest of Debtor's DIP motion.  (*See* A11-214, 721-1368.)  On March 31, 2011, the court granted the motion, finding that:  (1) "Debtor . . . cannot obtain this credit under less onerous terms than those offered by JMB"; (2) CenterPoint's interest

in Debtor's property was adequately protected; and (3) JMB was acting in good faith.  (A-1407, 1416.)

On February 14, 2011, the court issued an order denying CenterPoint's motion to enforce the conditional denial of its stay motion, saying that CenterPoint had misinterpreted the conditions on which the order was based:

> While the trial on CenterPoint's stay relief motion was pending, a special receiver had been appointed to remedy certain building code violations found by a City of Chicago building inspector.  Such a receiver would ordinarily make repairs and charge its fees and expenses against the subject property.  To protect the value of the property, Debtor was ordered, as a condition of keeping the automatic stay in effect, to complete the repairs itself without allowing the (probably very expensive) special receiver to charge any extra fees against the property.
>
> In addition, the trial on CenterPoint's stay relief motion concluded shortly before the next installment of real estate taxes were due.  Concern was expressed that Debtor might not be able to pay the taxes, thereby forcing CenterPoint to pay the taxes itself to avoid a tax sale.  Therefore, as a condition of the stay remaining in effect, Debtor was ordered to pay the taxes when they were due. . . .
>
> In the circumstances surrounding the entry of the Stay Order, the language "without allowing CenterPoint's collateral to be charged" was intended to refer only to the need for property repairs, and need for Debtor to avoid allowing CenterPoint's interest to be affected if it missed the real estate tax payment. . . .  Therefore, the subsequent order allowing [the DIP] lien did not conflict with the Stay Order . . . .

(A-1428-29.)

### Discussion

#### Motion to Amend Findings

"Rulings on motions to amend findings are committed to the sound discretion of the district court and will not be disturbed absent an abuse of that discretion."  Charles Allen Wright & Arthur R. Miller, 9C Federal Practice and Procedure § 2582 (3d ed.); *see Nat'l Metal Finishing Co., Inc.*

*v. BarclaysAmerican/Commercial, Inc.*, 899 F.2d 119, 125 (1st Cir. 1990) ("[T]he trial court's actions in amending its findings are reviewable only for abuse of discretion.").

Federal Bankruptcy Rule of Procedure 7052 allows the court "[to] amend its findings . . . or make additional findings," if a party so requests within fourteen days after judgment is entered. Fed. R. Bankr. P. 7052; Fed. R. Civ. P. 52(b). CenterPoint contends that the bankruptcy court violated this rule by *sua sponte* amending its oral finding that "there was no equity cushion" by issuing a written finding, more than fourteen days later, that there is an equity cushion of more than $33 million. However, the premise of CenterPoint's argument, that the court's September 17, 2010 oral findings were final, is faulty. The bankruptcy court explicitly said that the oral findings would subsequently be supplemented in writing. (*See* A-516 ("[T]he following . . . will serve as opinions and findings to be supplemented when we have an opportunity to do the work to file a supplement . . . ."); A-520 ("[T]he motion to modify stay will be denied for these reasons, to be further amplified in . . . more detailed findings and conclusions to be made and entered when we have the time to complete that.").) Moreover, even if the court had said nothing, the written findings would, as a matter of law, control. *See Greiner v. Chi. & E. Ill. R.R. Co.*, 360 F.2d 891, 895 (7th Cir. 1966) ("We may not treat the Trial Court's oral comment as a special finding that modifies his formal Findings of Fact. The latter must be viewed as controlling."); *see also Delia v. City of Rialto*, 621 F.3d 1069, 1073 n.3 (9th Cir. 2010) ("Because the district court's written order postdates its oral statement, we will proceed on the presumption that the district court abandoned its prior oral reasoning for granting summary judgment" and "rely exclusively on the district court's written order"), *cert. granted, Filarsky v. Delia*, 80 U.S.L.W. 3015 (U.S. Sept. 27, 2011) (No. 10-1018); *O'Neill v. AGWI Lines,* 74 F.3d 93, 95 (5th Cir. 1996) ("[T]o the extent . . . the district court's

statements from the bench conflict with its formal findings and conclusions of law, we need not consider them." ).

The preliminary nature of the oral findings also dooms Centerpoint's argument that the court's action violates the law-of-the case doctrine. That doctrine "establishes a presumption that a ruling made at one stage of a lawsuit will be adhered to throughout the suit." *Avitia v. Metro. Club of Chi., Inc.*, 49 F.3d 1219, 1227 (7th Cir. 1995). As the bankruptcy court made abundantly clear, its oral findings were made "tentative[ly] as [it] prepared to analyze the large volume of evidence . . . . to provide guidance to counsel as to the general reasons that stay relief would be denied." (A-7.) Because the oral findings were avowedly preliminary, they were not a "ruling" for purposes of the law-of-the-case doctrine.

In short, the record does not support CenterPoint's claim that the bankruptcy court's December 10, 2010 order denying the motion to amend was an abuse of discretion. The Court, therefore, affirms that order.

**DIP Orders**

Debtor argues that the statutory ban on appellate review of unstayed orders permitting a debtor to obtain good-faith DIP financing renders moot CenterPoint's appeals of the DIP orders in this case. *See* § 364(e) ("The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith . . . unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal."). Though courts have used

"mootness" to describe § 364(e)'s effect on appeals of unstayed DIP orders, *see, e.g.*, *In re W. Pac. Airlines, Inc.*, 181 F.3d 1191, 1195 (10th Cir. 1999); *In re Adams Apple*, 829 F.2d 1484, 1489 (9th Cir. 1987), that doctrine does not quite fit. Mootness refers to "circumstances that destroy the justiciability of a suit previously suitable for determination," Charles Allen Wright & Arthur R. Miller, 13B Federal Practice and Procedure § 3533 (3d ed.) and, under § 364(e), appeals of unstayed DIP orders are never justiciable. The question really seems to be whether the statute strips the Court of subject matter jurisdiction over what would otherwise be a justiciable appeal. *Cf. Rent Stabilization Ass'n v. Dinkins*, 5 F.3d 591, 594 n. 2 (2d Cir. 1993) (stating that "standing addresses the question whether a federal court may grant relief to a party in the plaintiff's position, subject matter jurisdiction addresses the question whether a federal court may grant relief to any plaintiff given the claim asserted."). In any event, the essence of Debtor's argument is that the Court cannot entertain Centerpoint's appeals of the DIP orders.

CenterPoint contends that § 364(e) only precludes appellate review if: (1) the unstayed DIP order contains an explicit finding of good faith; and (2) the funding it allows has been fully disbursed. Because the December 13, 2010 order does not contain an explicit finding of good faith and the funds allowed by the March 31, 2011 funds have not been fully disbursed, CenterPoint argues that the Court can decide the appeals of the former and the portion of the latter allowing Debtor to borrow funds that have yet to be disbursed.

CenterPoint's contention that § 364(e) requires an explicit finding of good faith is based on a Sixth Circuit case. *See In re Revco D.S., Inc.*, 901 F.2d 1359, 1366 (6th Cir. 1990)("[A]n implicit finding of 'good faith' in a § 364(e) context is insufficient."). The Seventh Circuit has yet to decide whether an explicit finding of good faith is required. However, its decision in *In re EDC Holding*

*Corp.*, 676 F.2d 945 (7th Cir. 1982), suggests that it is not. The debtor in that case defaulted on a

loan from Chase Bank that was secured by its inventory and the Chase bank account that funded its

payroll. *Id.* at 946. When Chase set off the defaults from the bank account, the debtor's paychecks

to its employees bounced. *Id.* After the debtor filed for bankruptcy, its employees' union sued the

debtor and Chase, alleging that the union had a lien on the debtor's inventory for unpaid wages that

was senior to that of Chase. *Id.* Ultimately, the parties entered into a settlement in which they

agreed that: (1) Chase would loan the debtor $1.7 million, $77,000.00 of which would pay used to

pay the union's legal fees; (2) Chase would take possession of the inventory; and (3) the union

would dismiss its suit. *Id.* The parties also agreed that the debtor would use $77,000.00 of the loan

proceeds to pay the union's legal fees. *Id.* The bankruptcy court approved the DIP loan

contemplated by the parties' settlement, despite the other creditors' objection that the legal fee

payment was not entitled to priority under § 364. *Id.* The creditors appealed the bankruptcy court's

order, but because they had not moved for a stay of the order approving the DIP loan, the district

court dismissed the appeal as moot. *Id.* at 946-47.

The Seventh Circuit's reversed the district court in an opinion that suggests that the

substance of a challenged transaction, not whether the magic words "good faith" appear in an order,

determines whether a DIP transaction was in good faith:

> Chase argues that [a loan is made in good faith] so long as [its] terms are not
> misrepresented to the bankruptcy judge . . . , no matter how obviously erroneous the
> order is. But if this is what Congress intended, the words "in good faith" could have
> been deleted, as it would be perfectly clear even without them that an order obtained
> from a bankruptcy judge by fraud was ineffective to put the lender who procured the
> order ahead of other creditors. . . . If the lender knows his priority is invalid but
> proceeds anyway in the hope that a stay will not be sought or if sought will not be
> granted, we cannot see how he can be thought to be acting in good faith.
>
> . . . .

> Where it is evident from the loan agreement itself that the transaction has an intended effect that is improper under the Bankruptcy Code, the lender is not in good faith, and it is irrelevant what the improper purpose is.

*Id.* at 947-48; *see In re Foreside Mgmt Co., LLC*, 402 B.R 446, 453 (1st Cir. 2009) (rejecting the Sixth Circuit's explicit finding requirement and holding that a DIP loan is made in good faith for purposes of § 364(e) when "there is no evidence of any bad faith or improper motive on the part of the lender"); *Adams Apple*, 829 F.2d at 1489 (citing *EDC Holdings* and stating that "the integrity of an actor's conduct" determines the issue of good faith).

There is nothing in this record that suggests the loan authorized by the December 13, 2010 DIP order was, or the bankruptcy court believed it to be, anything other than an arms-length transaction between independent entities seeking to further their own commercial interests. (*See generally* A-215-410.)[1]  Accordingly, the Court holds that it lacks subject matter jurisdiction over CenterPoint's appeal of that order.

CenterPoint fares no better with its appeal of the portion of the March 31, 2011 DIP order that allows Debtor to borrow funds that have not yet been disbursed.  CenterPoint's contention that this appeal is still live rests entirely on the Third Circuit's holding to that effect in *In re Swedeland Development Group, Inc.*, 16 F.3d 552, 560-61 (3d Cir. 1994) (en banc).  The *Swedeland* court acknowledged the tension between its reasoning and that of the Seventh Circuit in *EDC Holding Corp.*, but concluded nonetheless that:

> [There is] no reason why section 364(e) should be understood to protect a lender with respect to money it has not disbursed.  Surely if a section 364(d) order is reversed and thereafter the lender makes no further disbursements, the lender does

---

[1]Indeed, the very fact that the court approved the order suggests that the loan was made in good faith.  *See* § 364(e) (authorizing bankruptcy courts to approve DIP orders only for loans made in good faith).

12

> not need protection for the funds which it has retained. At most, the lender has lost
> the expectation of making a loan on terms which it has found acceptable.
>
> We acknowledge that a lender might be disappointed in its expectations by a reversal
> of a section 364(d) order but there is nothing unusual in such frustration. In other
> contexts, a lender that has given a loan commitment could be frustrated in its
> expectations if the borrower for any of many reasons does not complete the
> transaction either before or after taking an initial disbursement. A borrower, among
> other things, could die, abandon a project, become insolvent, or go bankrupt. Such
> events are commonplace, and lenders surely recognize that they can happen.

*Id.* at 561.

The unstated premise of this analysis is that a lender's risk of having an "[in]complete"

transaction is the same for loans made to bankrupt borrowers as it is for those made to borrowers

who are solvent. If that were true, § 364 and its "escalating series of inducements [that] a debtor in

possession may offer to attract credit in the post-petition period," would be superfluous. *In re*

*Sobiech*, 125 B.R. 110, 114 (Bankr. S.D.N.Y.) (quotation omitted), *aff'd*, *Mulligan v. Sobiech*, 131

B.R. 917 (S.D.N.Y. 1991).

Moreover, the expectations that the *Swedeland* court so lightly dismissed are the foundation

of contract law, *see* Restatement (Second) of Contracts § 347, and the animating force behind §

364(e):

> [This provision] seek[s] to overcome people's natural reluctance to
> deal with a bankrupt firm whether as purchaser or lender by assuring
> them that so long as they are relying in good faith on a bankruptcy
> judge's approval of the transaction they need not worry about their
> priority merely because some creditor is objecting to the transaction
> and is trying to get the district court or the court of appeals to reverse
> the bankruptcy judge.

*EDC Holding*, 676 F.2d at 947; *In re Ellingsen MacLean Oil Co., Inc.*, 834 F.2d 599, 603 (6th Cir.

1987) ("Section 364 is designed to encourage postpetition financing by . . . giving the lender priority

. . . . [and] protect[ing] the authorization for priority on a lien from reversal or modification on

appeal, as long as the order has not been stayed pending appeal and the creditor extended credit in good faith.").

Finally, interpreting § 364(e) to apply to all loan funds approved by the § 364 order, whether or not they have been disbursed, does not leave pre-petition lien-holders without a remedy. Rather, as the Seventh Circuit noted, their remedy is set forth in the statute – a stay pending appeal. *EDC Holding*, 676 F.2d at 947 ("The proper recourse for the objecting creditor is to get the transaction stayed pending appeal."). For all of these reasons, the Court finds *Swedeland* unpersuasive and holds that CenterPoint's failure to obtain a stay deprives the Court of subject matter jurisdiction over its appeal of the March 31, 2011 DIP order.

**Motion to Enforce**

CenterPoint also appeals the bankruptcy court's refusal to enforce its order denying CenterPoint's stay motion on the condition that, among other things, Debtor paid its property taxes "without allowing CenterPoint's collateral to be charged." (A-452.) CenterPoint argues that Debtor's use of DIP financing to pay property taxes violated that condition, and the bankruptcy court erred when it ruled otherwise.

The bankruptcy court's decision was based on its interpretation of the conditions on which it had denied CenterPoint's stay motion. (*See* A-1428-29 ("In the circumstances surrounding the entry of the Stay Order, the language 'without allowing CenterPoint's collateral to be charged' was intended to refer only to the need for property repairs, and need for Debtor to avoid allowing CenterPoint's interest to be affected if it missed the real estate tax payment. . . . Therefore, the subsequent order allowing [the DIP] lien did not conflict with the Stay Order . . . .").) "The

14

[bankruptcy] court is in the best position to interpret its own orders" and we will reverse its interpretation only if "the record clearly shows an abuse of discretion." *In re Chi., Rock Island & Pac. R.R. Co.*, 865 F.2d 807, 810 (7th Cir. 1988) (quotation omitted). "A decision constitutes an abuse of discretion when it is not just clearly incorrect, but downright unreasonable." *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 131 F.3d 625, 628 (7th Cir. 1997) (quotation omitted).

As the bankruptcy court explained, its ruling on CenterPoint's stay motion was made shortly after a state receiver was appointed to remediate building code violations on Debtor's properties and immediately before a property tax payment was due. (A-1428.) Given the context, the court said, the no-charge-to-collateral condition barred Debtor from shifting repair costs to CenterPoint or imperiling its lien by triggering a tax sale. (A-1427-28.) Because that is not an unreasonable interpretation of the order conditionally denying the stay motion, the bankruptcy court did not abuse its discretion by refusing to enforce it.

## **Conclusion**

For the reasons set forth above, the Court:  (1) affirms the bankruptcy court's December 10, 2010 order denying CenterPoint's motion to amend findings of fact and conclusions of law and its February 14, 2011 order denying CenterPoint's motion to enforce; and (2) dismisses for lack of subject matter jurisdiction CenterPoint's appeals of the December 13, 2010 and March 31, 2011 orders granting Debtor's motion to enter into a debtor-in-possession credit facility secured by a superpriority priming lien on the Debtor's assets.  This case is terminated.

**SO ORDERED.**                                                            **ENTERED:     September 30, 2011**

_____
**HON. RONALD A. GUZMAN**
**United States District Judge**

16